2021 IL App (1st) 191959

SIXTH DIVISION
December 23, 2021

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-19-1959

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 2012 COAC 1 |
| STATE REPRESENTATIVE MONIQUE DAVIS, | ) ) ) | Honorable James R. Carroll, |
| Defendant-Appellant. | ) ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justice Oden Johnson concurred in the judgment and opinion.
Presiding Justice Pierce dissented with opinion.

**OPINION**

¶ 1    In April 2012, the Cook County State's Attorney's Office (County), in the name of the People of the State of Illinois, filed a complaint against the defendant in this case, former State Representative Monique Davis (Rep. Davis), seeking to recover hundreds of thousands of dollars in delinquent property taxes that the County insists are owed on a leased office space that, for around two decades, served as Rep. Davis's local district office.

¶ 2    During the many years of litigation that followed, Rep. Davis, who is represented by the Attorney General of Illinois, has maintained that the only party with potential liability in this matter is the State, meaning that any claim for payment of the assessed taxes must be filed in the court of claims, and that the circuit court thus lacks subject-matter jurisdiction over this dispute. The

County, in turn, has insisted that liability belongs solely to Rep. Davis and that the claims against her were properly filed in the circuit court. The circuit court agreed with the County and granted it summary judgment and a monetary judgment in its favor of $493,852.86.

¶ 3     For the following reasons, we reverse the circuit court's grant of summary judgment in favor of the County, enter summary judgment in favor of Rep. Davis, and vacate the monetary judgment against Rep. Davis.

¶ 4                                I. BACKGROUND

¶ 5     The essential facts of this case are largely undisputed.

¶ 6                                A. The Lease

¶ 7     On August 24, 1988, Rep. Davis entered into an agreement to rent 1234 West 95th Street (the Property), a vacant, one-story office building owned and operated by the Chicago Board of Education (CBE). At the time, Rep. Davis was a recently elected member of the Illinois House of Representatives and was in the market for a space to house her local district office. CBE agreed to rent the space to Rep. Davis, and both parties signed a typewritten lease where the parties "covenant[ed] and agree[d]" that Rep. Davis could "use and occupy said premises as the offices for the State Representative of the 35th District." A subsequent provision clarified that the building could not be used "for any purpose other than specified." While the lease did not expressly name the State of Illinois as a party to the transaction, it repeatedly referred to the lessee by her official title, "State Representative Monique Davis."

¶ 8     Article 4 of the lease, which dealt with "Taxes and Assessments," contained a clause specifying that in addition to monthly rent payments, Rep. Davis would agree to "bear, pay and discharge" any taxes, assessments, or levies imposed upon the leasehold during the term of the lease. Rep. Davis signed her initials in the margin next to this provision and included a handwritten

note specifying that "[s]uch taxes and assessments" would be "prorated to the date on which the lessee [took] occupancy of the premises." Additionally, the final paragraph of Article 4 stated the following: "[t]he Office of the State Representative is tax exempt and shall furnish the Lessor with a copy of its tax exempt status 15 days after execution of this lease." Rep. Davis did not provide evidence of her tax-exempt status within the specified 15-day period or at any other time during her occupancy of the Property.

¶ 9    The CBE repeatedly renewed Rep. Davis's lease. For over a decade, the CBE received monthly rent payments, and Rep. Davis used the building as her local district office. During this period, property tax bills were consistently levied against the Property.

¶ 10                              B. The Property's Tax Status

¶ 11    As property of the CBE, the office space was exempt from taxation under a provision of the tax code that broadly exempted school district property from taxation. Ill. Rev. Stat. 1987, ch. 120, ¶ 500.1. Specifically, that statute exempted "all property of schools *** including the real estate on which the schools are located and any other real property used by such schools exclusively for school purposes, not leased by such schools or otherwise used with a view to profit." *Id.*

¶ 12    A separate statutory provision in effect at the time Rep. Davis entered her lease provided that a taxable leasehold estate would be created for school district property leased to another "whose property is not exempt" and that in such cases "the leasehold estate and the appurtenances shall be listed as the property of the lessee thereof, or his assignee, as real estate." *Id.* ¶ 507. This provision, now found at section 9-195 of the Property Tax Code (35 ILCS 200/9-195 (West 2020)) is the one under which the County has pursued Rep. Davis for property taxes in this case. The section provides, now as it has at all times relevant to this litigation, that "when property which is

exempt from taxation is leased to another whose property is not exempt" "[t]axes on that property shall be collected in the same manner as on property that is not exempt, and the lessee shall be liable for those taxes." *Id.*

¶ 13                            C. Rep. Davis's Office Allowance

¶ 14    Although not referenced specifically in the lease, Rep. Davis's authority to expend money setting up and running a local office was provided for by what is today section 4 of the General Assembly Compensation Act (25 ILCS 115/4 (West 2020)), entitled "Office allowance." While this law has been modified over the years, at the time Rep. Davis signed the lease, the statute provided, in pertinent part:

"each member of the House of Representatives is authorized to approve the expenditure of not more than $35,000 per year *** to pay for 'personal services', 'contractual services', 'commodities', 'printing', 'travel', 'operation of automotive equipment', and 'telecommunications services', as defined in 'An Act in relation to State finance'." Ill. Rev. Stat. 1987, ch. 63, ¶ 15.1

¶ 15    "Contractual services," was defined elsewhere to include "[e]xpenditures for rental of property or equipment." Ill. Rev. Stat. 1987, ch. 127, ¶ 151a(b). This definition of "contractual services" has remained consistent through today. See 30 ILCS 105/15a(b) (West 2020).

¶ 16                            D. The Illinois Department of Revenue Decision

¶ 17    In 1998, a decade after she signed the original lease, Rep. Davis applied for a tax exemption with the Illinois Department of Revenue (IDOR). Specifically, she applied for a non-homestead property tax exemption based on her status as a state representative and the fact that she used the property in question solely to "conduct affairs pursuant to [her] job." Question 13 on the IDOR property tax exemption application asked whether any income was derived from the property and

Rep. Davis checked "yes," stating: "Rep. Davis [l]eases the property from the Chicago Board of Education."

¶ 18    The IDOR denied Rep. Davis's application. In what appears to be a form letter issued on November 6, 1998, the IDOR simply stated that "[b]ased on the statement of facts and supporting documentation in the application," the property was "not in exempt ownership" or "exempt use." The letter concluded: "If you do not agree with this this decision, you must send us a written request for a formal hearing within 20 days." Rep. Davis took no action in response to the letter.

¶ 19                      E. Rep. Davis's Relationship With CBE Deteriorates

¶ 20    In May 2002, a representative of the CBE informed Rep. Davis that her lease would not be renewed and asked that she and her staff vacate the premises when her current two-year rental term concluded at the end of June. Rep. Davis did not vacate the premises. Subsequently, the CBE stopped receiving monthly rent payments. The CBE took no action, however, until 2009, when it sued Rep. Davis in the circuit court for breach of contract, seeking ejectment and the recovery of $83,737.35 in unpaid rent. The complaint also referenced Rep. Davis's "[f]ailure to pay Real Estate taxes in the amount of $432,640.30 in accordance with Article 4 of the Lease."

¶ 21    In February 2010, the circuit court dismissed the rent suit, explaining in a short, handwritten order that it lacked jurisdiction to hear the matter and that the case should be refiled in the court of claims. The CBE refiled the case in the court of claims in October 2010. In June 2015 the CBE and the State of Illinois settled that case with the State agreeing to pay the CBE $181,476.30 in full satisfaction of the unpaid rent. The issue of Rep. Davis's alleged failure to pay taxes, however, remained unresolved.

¶ 22                      F. The County Initiates Proceedings

¶ 23    The County's efforts to collect the property taxes at issue here date from at least 2005,

when the circuit court entered a judgment and order of sale concerning several properties that the Cook County Treasurer's Office had identified as ones associated with a delinquency for failure to pay taxes. The Property, which Rep. Davis and her staff had at that point occupied for 17 years without paying taxes, was included on this list.

¶ 24   In typical cases involving significant delinquent taxes, the county attaches a tax lien to the property and, if the taxes are not paid, enforces the lien through a forced sale. But that was not an option in this case because the property was owned by the CBE, a tax-exempt institution. Section 9-195 of the Property Tax Code, referenced above, while providing that taxes on otherwise tax-exempt property leased for profit "shall be collected in the same manner as on property that is not exempt, and the lessee shall be liable for those taxes," also expressly states that "no tax lien shall attach to the exempt real estate." 35 ILCS 200/9-195 (West 2020).

¶ 25   In April 2012, the County initiated this collection action against Rep. Davis in her personal capacity, seeking a monetary judgment for the delinquent taxes, penalties, and costs accrued on the Property between 1991 and 2009. The complaint did not seek to collect taxes from the period between 1988 and 1990 because those taxes were by then over 20 years old and thus presumed uncollectible under section 20-180 of the Property Tax Code. 35 ILCS 200/20-180 (West 2010).

¶ 26                                G. Procedural History

¶ 27   In June 2012, Rep. Davis moved to dismiss the County's suit, arguing that that the circuit court lacked subject-matter jurisdiction over the case. Rep. Davis maintained that she was only nominally a defendant, that the action was really a dispute between Cook County and the State of Illinois, and that she was improperly being sued in her personal capacity for activities she had undertaken while conducting official state business (*i.e.*, renting and managing a district office). She argued that because the proper defendant in this suit was not her, but the State, sovereign

immunity prevented the circuit court from hearing the case and the only court with jurisdiction over the suit was the Illinois Court of Claims.

¶ 28 On March 12, 2013, the circuit court issued a 21-page opinion denying Rep. Davis's motion to dismiss and concluding that sovereign immunity did not apply. The circuit court, quoting *Currie v. Lao*, 148 Ill. 2d 151, 159-66 (1992), focused heavily on the "source-of-the-duty" analysis commonly invoked in tort cases, explaining that when a state employee breaches a duty or obligation that "would arise generally regardless of whether the individual worked for the state or not, then the action against the individual is not 'against the State of Illinois.' "

¶ 29 Five years later, the parties filed cross-motions for summary judgment. Rep. Davis again invoked sovereign immunity, arguing that the State was the appropriate defendant and that the circuit court lacked jurisdiction. On May 29, 2019, the circuit court denied Rep. Davis's motion and granted the County's. The court incorporated and built on the reasoning of the earlier judge's decision denying Rep. Davis's motion to dismiss, concluding that her "central argument that the State of Illinois is the real party in interest in this matter [was] without any support in the Lease, in fact or in law." On August 30, 2019, the circuit court entered a judgment against Rep. Davis in the amount of $493,852.86, representing the taxes, penalties, and interest accrued as of that date. Enforcement of the judgment was stayed pending this appeal.

¶ 30                                   II. JURISDICTION

¶ 31 Rep. Davis seeks reversal of the circuit court's May 29, 2019, order granting summary judgment in favor of the County and seeks to vacate the August 30, 2019, monetary judgment against her. On September 26, 2019, Rep. Davis timely filed a notice of appeal. Our jurisdiction rests on Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), which allow appeals from final judgments entered by circuit courts in civil cases.

¶ 32                                    III. ANALYSIS

¶ 33                                 A. Standard of Review

¶ 34     This case was decided on cross-motions for summary judgment. "Summary judgment is proper when 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Bremer v. City of Rockford*, 2016 IL 119889, ¶ 20 (quoting 735 ILCS 5/2-1005(c) (West 2008)). Where, as here, parties have filed cross-motions for summary judgment, "they agree that only questions of law are involved and invite the court to decide the issues based on the record." *Id.* Our review of the order granting summary judgment in the County's favor is *de novo*. *Id.* Rep. Davis has not questioned the calculation of taxes that the County claims is due and thus the only issue is the one decided on the parties' cross motions: does sovereign immunity bar this claim against Rep. Davis in the circuit court?

¶ 35                                 B. Sovereign Immunity

¶ 36     Sovereign immunity is a common law doctrine that protects the government from being sued without its consent. *Jackson v. Alverez*, 358 Ill. App. 3d 555, 559 (2005). The use of sovereign immunity in Illinois courts is governed by the State Lawsuit Immunity Act (Immunity Act) (745 ILCS 5/1 (West 2020)), which resuscitated the doctrine after it was briefly abolished with the adoption of the Illinois Constitution of 1970. See Ill. Const. 1970, art. XIII, § 4; *Parmar v. Madigan*, 2018 IL 122265, ¶ 19. Section 1 of the Immunity Act states that "[e]xcept as provided *** , the State of Illinois *shall not* be made a defendant or party in any court." (Emphasis added.) 745 ILCS 5/1 (West 2020).

¶ 37     Here, the relevant legislative carveout alluded to in the Immunity Act is the Court of Claims Act, which grants the Illinois Court of Claims exclusive jurisdiction over particular categories of

lawsuits against the State, including "[a]ll claims against the State founded upon any law of the State of Illinois" and "[a]ll claims against the State founded upon any contract entered into with the State of Illinois." 705 ILCS 505/8(a), (b) (West 2020). This includes breach-of-contract actions against the State, which, as our supreme court explained in *Smith v. Jones*, 113 Ill. 2d 126, 133 (1986), are "specifically directed to the Court of Claims."

¶ 38    As a general matter, "substance takes precedence over form" (*Leetaru v. Board of Trustees of the University of Illinois*, 2015 IL 117485, ¶ 44), such that "[t]he determination of whether an action is one against the State does not necessarily depend on whether the State is named as a party." *Brandon v. Bonell*, 368 Ill. App. 3d 492, 504 (2006) (citing *Kawaguchi v. Gainer*, 361 Ill. App. 3d 229, 243 (2005)). As our supreme court has explained, a substantive analysis is necessary to prevent plaintiffs from strategically "evad[ing] the jurisdiction of the Court of Claims by naming a servant or agent of the state as the nominal defendant when the State of Illinois [was] the real party in interest." *Loman v. Freeman*, 229 Ill. 2d 104, 112 (2008). For this reason, it has repeatedly held that "the determination of whether an action is one against the State depends upon *the issues involved and the relief sought* and not simply the formal identification of the parties." (Emphasis added.) *Parmar*, 2018 IL 122265, ¶ 22.

¶ 39    On appeal, Rep. Davis argues that, because she leased the Property in her official capacity as a state representative and used it only for official purposes, the tax collection action against her is in reality an action "against the State," such that sovereign immunity applies. Rep. Davis insists that the circuit court lacked subject-matter jurisdiction over this matter, as the only venue with the authority to hear claims against the State is the court of claims. Rep. Davis also warns of the public policy consequences that will result if she is held liable, stating: "[i]f state officials could be held personally liable for contracts signed on behalf of the State, few if any would be willing to sign

them, making it difficult or impossible for the State to lease properties or purchase items from vendors."

¶ 40    In response, the County, relying primarily on the "source-of-the-duty" test, argues that upon examining the "issues involved and the relief sought," this action cannot be properly characterized as one "against the State" because Rep. Davis's "duty" to pay leasehold taxes arose independently of her relationship with the State of Illinois. Thus, the County asserts, sovereign immunity is inapplicable, subject-matter jurisdiction was proper in the circuit court, and it was entitled to summary judgment as a matter of law.

¶ 41    As our supreme court has made clear, substance must take precedence over form when determining whether sovereign immunity applies. In our view, the case turns on a straightforward question: when Rep. Davis signed the lease with CBE—the event which gave rise to the tax liability at issue today—was she acting as an authorized agent of the State of Illinois or was she acting autonomously, on her own behalf? If the former is true, CBE leased this property to the State of Illinois with Rep. Davis serving merely as an authorized intermediary. In such a case, the only possible venue with jurisdiction to hear this dispute is the court of claims, which, as previously mentioned, has exclusive jurisdiction over "[a]ll claims against the State founded upon any contract entered into with the State of Illinois." 705 ILCS 505/8(b) (West 2020). If the latter is true, then the State is not a party to this dispute, sovereign immunity does not apply, and Rep. Davis is personally liable for the delinquent taxes at issue. In our view, Rep. Davis was authorized to enter into this lease on behalf of the State and the State is thus the real party in interest.

¶ 42                    C. The Office Allowance Statute

¶ 43    When Rep. Davis signed the lease with CBE, she did so pursuant to express authority granted to her by an office allowance statute (Ill. Rev. Stat. 1987, ch. 63, ¶ 15.1), which empowered

- 10 -

her to enter into a binding contract with CBE and incur expenses *on behalf of* the State of Illinois. As noted above, that statute expressly provided that:

> "each member of the House of Representatives is authorized to approve the expenditure of not more than $35,000 per year *** to pay for 'personal services', 'contractual services', 'commodities', 'printing', 'travel', 'operation of automotive equipment', and 'telecommunications services', as defined in 'An Act in relation to State finance'." *Id.*

"Contractual services," was defined elsewhere to include "[e]xpenditures for rental of property." Ill. Rev. Stat. 1987, ch. 127, ¶ 151a(b). Although the dissent argues that contractual services does not include "leasehold taxes" (*infra* ¶ 92), there can be no dispute that the taxes in this case, had they been paid, would have been an "expenditure" for rental property that Rep. Davis leased.

¶ 44    This statute authorized Rep. Davis to negotiate this lease on behalf of the State. Not only did it provide her with a financial guarantee from the State treasury to cover certain office-related costs, including "contractual services" related to rent, but critically—as long as she abided by certain accounting procedures and regulations elaborated by the General Assembly and the limitations within the statute itself—the statute empowered her to serve as an intermediary and enter into contracts with third parties that would be binding on the State of Illinois.

¶ 45    The fact that Rep. Davis was *authorized* to act on behalf of the State is confirmed by the plain text of the statute, which specifically uses the words "authorized to approve." Additionally, subsequent sections of the statute clarify the central role played by the Illinois House of Representatives—an arm of the State—in allocating these funds and regulating the types of contracts that can be entered into by state representatives on behalf of State.

¶ 46    The very next section of the statute makes clear that "[p]ayment techniques and procedures shall be according to rules made by *** the House Rules Committee." Ill. Rev. Stat. 1987, ch. 63,

¶ 15.2. And the section after that prohibits state representatives from authorizing payments to relatives. *Id.* ¶ 15.3. Additionally, the office allowance statute charges the Clerk of the House with a number of administrative responsibilities, including keeping an inventory of purchases made by the state representatives and ensuring that equipment purchased costs "less than would be charged for renting or leasing the equipment." *Id.* ¶ 15.1.

¶ 47    The version of the office allowance statute in force today is similar to the one in effect in 1988. The Clerk of the House continues to play an active role in administrating the allowance. 25 ILCS 115/4 (West 2020). In addition, Rule 6(b)(16) in the current Rules of the House of Representatives (102d Gen. Assem., House Res. 72, 2021 Sess. (House Rule 6(b)(16))) requires the Clerk of the House to "review vouchers to be presented to the Comptroller for payment of expenditures related to the operations of the House, including vouchers for payment from members' office allowances under the General Assembly Compensation Act." Rule 6(b)(16) also grants the Clerk "authority to deny [a] voucher if the expenditures or payment is not properly authorized." *Id.*

¶ 48    In addition to these textual provisions, which delineate the State's significant involvement in these types of transactions, Rep. Davis's authority to enter into this lease on behalf of the State is confirmed by the fact that when CBE sued her for back rent, the State settled this matter in the court of claims. Like the text of the statute itself, that court of claims settlement—while certainly not binding on this court or on the County, who was not a party to that suit—reflects the existence of an agential relationship between the State of Illinois and Rep. Davis. Our reading of the allowance statute and the actual authority it confers on state representatives to enter into contracts on behalf of the State is entirely consistent with the State's decision to ultimately settle that dispute in the court of claims by paying the full amount of rent due. If, as the settlement in the court of

claims makes clear, the State was the party responsible for the unpaid back rent on this lease, it follows that the State was the party responsible for any property taxes owed as result of this lease.

¶ 49    The premise of the dissent is that the office allowance statute only authorized Rep. Davis to either submit a voucher setting up direct payments from the State treasury to the landlord or spend her own money directly and then seek reimbursement from the State. *Infra* ¶ 94. But the record is silent as to how exactly the CBE was paid its monthly rent and mentions nothing about a voucher or reimbursement procedure. What is clear, however, is that when CBE was *not* paid, it was only made whole after suing the *State* directly for the unpaid rent in the court of claims.

¶ 50    The dissent also notes that the office allowance statute does not contain the extensive regulations that govern many state authorizations to expend state money. *Infra* ¶ 100. That is true, but the office allowance statute did contemplate that that "[p]ayment techniques and procedures shall be according to rules made by *** the House Rules Committee" (Ill. Rev. Stat. 1987, ch. 63, ¶ 15.2), and the statute continues to provide for oversight as to how these expenditures are authorized.

¶ 51    In sum, in contrast to a state employee who decides without any authority, statutory or otherwise, to rent office space for the purpose of conducting state business, here, when Rep. Davis signed her lease, she possessed specific statutory authority to bind the State. This authority makes her lease, in reality, a contract between the State of Illinois and the CBE.

¶ 52    The fact that Rep. Davis had authority to bind the State on this lease is *the* critical fact in deciding whether the circuit court had proper subject-matter jurisdiction in this case. The parties do not dispute that the court of claims has exclusive jurisdiction over "[a]ll claims against the State founded upon any law of the State of Illinois" and "[a]ll claims against the State founded upon any contract entered into with the State of Illinois." 705 ILCS 505/8(a), (b) (West 2020). Nor do they

dispute that breach-of-contract actions against the State are "specifically directed to the Court of Claims." *Smith*, 113 Ill. 2d. at 133. While the County's suit is not technically for breach of contract, potential liability for these property taxes derives from the fact that this was a contract to rent property. If the State is the lessee in this contract, then the State is the only party who could be responsible for any taxes that might be due.

¶ 53                    D. The Source-of-the-Duty Test

¶ 54    Rather than focusing on the question of authority—which in our view is the dispositive question in this case—the County centers its analysis on the source of Rep. Davis's duty to pay taxes, concluding that the taxes levied on the Property belonged solely to Rep. Davis because her duty to pay them was independent of her role as a state representative.

¶ 55    Applying the framework established by our supreme court in *Healy v. Vaupel*, 133 Ill. 2d 295, 309 (1990), the County explains that an action against a State employee is considered an action "against the State" only where (1) there are "no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts"; (2) "the duty alleged to have been breached was not owed to the public generally independent of the fact of [s]tate employment"; and (3) "the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State." (Internal quotation marks omitted.)

¶ 56    Here, the County concedes that the first and third criteria of the *Healy* analysis are satisfied, as it is undisputed that Rep. Davis acted within the scope of her authority when she signed a lease for a local district office, and it is also undisputed that signing a lease for such a purpose is an activity falling within the ordinary, official functions of a state-elected official. The County insists, however, that the second criterion is not satisfied and that Rep. Davis breached a duty she owed to the public generally—to pay property taxes—and not one stemming solely from her status as a

state employee.

¶ 57 Under the source-of-the-duty test, "[w]hen [a] state employee allegedly breaches a duty that arises solely by virtue of his state employment, sovereign immunity will bar in [the] circuit court an action that is founded on that breach." *Brandon*, 368 Ill. App. 3d at 505. In contrast, "when an employee breaches a duty imposed independently of his state employment, he is entitled to no more immunity than is a private individual who breaches that same duty," and "the mere fact of his employment will not endow him with heightened protection." *Id.* An "independent duty" is understood as one imposed "by the employee's status as *something other than* an employee." (Emphasis added.) *Id.*

¶ 58 Applying this test, the County argues that Rep. Davis's duty to pay property taxes on her leasehold was an independent duty, one that she assumed when she negotiated and agreed to a specific arrangement with her landlord that exposed her to eventual tax liabilities under provisions of the Property Tax Code that would have applied to any renter in her position, regardless of whether they happened to be a state representative. The County's position is that while Rep. Davis incurred that duty *incident to* her status as a representative, the duty itself was not tied to that status but derived from an independent, statutory source. Accordingly, the County argues, because this tax liability arose from an independent duty, the three *Healy* factors are not satisfied, and it cannot be said that the case against Rep. Davis is effectively a case against the State. We do not find this argument convincing, and we agree with Rep. Davis that if the "source-of-the-duty" test is applicable here, she is entitled to the protection of sovereign immunity.

¶ 59 In our view, setting aside the question of the propriety of these taxes, any "duty" Rep. Davis had to pay them stemmed entirely and inseparably from her status as a state official. That status—which gave her certain rights and responsibilities that set her apart from other renters—

was the "source" of her acquiring what the County describes as a generalized "duty" to pay property taxes. In other words, the lease, and any potential tax consequences deriving from it, sprung directly from her official status.

¶ 60    The County's source-of-the-duty analysis separates Rep. Davis's authorized expenditure of state money to rent an office as an elected state official from her alleged obligation to pay taxes on that rental, but these two things must be viewed together. When so viewed, it is obvious that any "duty" she incurred arose "solely by virtue of [her] state employment," meaning that sovereign immunity bars "an[y] action that is founded on that breach" from proceeding in circuit court. *Id.* In sum, we do not find the County's "source-of-the-duty" analysis compelling. As stated above, in our view, the only relevant issue here is whether Rep. Davis was legally authorized to enter into this lease on behalf of the State of Illinois. She was. Thus, any obligations related to this rental are those of the State, meaning sovereign immunity applies.

¶ 61                    E. The Finite Nature of Rep. Davis's Allowance

¶ 62    The version of the office allowance statute in force when Rep. Davis signed her lease (Ill. Rev. Stat. 1987, ch. 63, ¶ 15.1) was silent about what would happen if a representative spent in excess of his or her annual office allowance. Starting in 2009, however, a new provision was added to the statute addressing that potentiality. Pub. Act 96-555 (eff. Aug. 18, 2009) (amending 25 ILCS 115/4). This provision, which has remained unchanged in subsequent versions of the statute, provides that "[n]othing in this Section prohibits the expenditure of personal funds or the funds of a political committee controlled by an officeholder to defray the customary and reasonable expenses of an officeholder in connection with the performance of governmental and public service functions." 25 ILCS 115/4 (West 2020).

¶ 63    The 2009 amendment made explicit what was already obvious: a representative's authority

to bind the State under the allowance statute, while real, has at all times been limited to the amount of the allowance. Representatives may take on contractual obligations in excess of their allowances, but if they do, they assume personal liability and will have to spend their own money or that of their campaigns when the bill comes due. Thus, in theory, if Rep. Davis entered into a lease that resulted in her *exceeding* her guaranteed allowance, then she would become—in her personal capacity—a party to that lease. Here, however, the County has never suggested that Rep. Davis expended more than her office allowance. Indeed, the record indicates that her rent was far less than the allowance provided. Thus, the fact that there is a built-in limit on the authorization provided by the office allowance statute does not change the outcome here.

¶ 64　　　　　　　　　　　F. The Legal Effect of the IDOR Determination

¶ 65　　The County argues that by denying Rep. Davis her requested property tax exemption, the IDOR necessarily analyzed the lease with the CBE and concluded that the leasehold was *not* state property. The dissent agrees, urging us not to give the IDOR determination "short shrift," and characterizing it as "final and unassailable" evidence that Rep. Davis had no authority to enter this lease on behalf of the State. *Infra* ¶¶ 83-84. But we have examined both Rep. Davis's application for a property tax exemption and the half-page form denial sent in response by IDOR and we simply cannot say that IDOR's decision to deny the requested exemption was the result of such a thorough analysis.

¶ 66　　The "Application for Property Tax Exemption To Board of Review/Appeals-Statement of Fact" submitted by Rep. Davis is two pages long. It asks a total of 15 questions, one of which is: "Is any income derived from this property?" Rep. Davis responded "yes" to that question, noting that, "Rep. Davis leases the property from the Chicago Board of Education." As far as we know, this technically correct but confusing answer on the application might have been the basis for the

exemption denial, since profit from use of the property can be the basis for losing an exemption. See, *e.g.*, *Three Angels Broadcasting Network, Inc. v. Dept. of Revenue*, 381 Ill. App. 3d 679, 698-99 (2008). Of course, Rep. Davis herself derived no income from the property but instead used it solely to conduct state business in her role as a state representative. Also, as the dissent notes (*infra* ¶ 84), IDOR itself was confused as to whether it was reviewing an exemption application for a leasehold interest or a fee interest, despite the fact that the application included a copy of the first page of the lease and explained that the property was leased from the CBE. All of this suggests that this may have been a *pro forma* denial, rather than the careful analysis posited by the dissent.

¶ 67    The County additionally argues that even if the IDOR determination was erroneous, in failing to appeal it, Rep. Davis waived any right to contest the ruling, in that forum or anywhere else. However, the question before us is whether sovereign immunity applies, and Rep. Davis's failure to file an administrative review action cannot be determinative on that question. As our supreme court has made clear, only the General Assembly, by statute and "in affirmative language" may waive sovereign immunity. *Parmar*, 2018 IL 122265, ¶ 31. Rep. Davis's failure to appeal an IDOR ruling is not a waiver of sovereign immunity and cannot control on the issue before this court.

¶ 68                    G. Other Concerns Raised By Dissent

¶ 69    The dissent frets that this decision could serve as a "template" for unscrupulous legislators wishing to avoid payment for services. *Infra* ¶ 75. This would, the dissent predicts, force unpaid vendors to take their chances suing the State in the court of claims. *Id.* But these fears are unfounded. If, as we have found here, a state representative is statutorily authorized to bind the State in a particular transaction, then of course the State should pay what is owed. If for whatever reason the State fails to satisfy its end of the bargain, then the situation will be remedied

appropriately in the court of claims, which exists precisely to deal with these types of disputes. As noted above (*supra* ¶ 21), this is exactly what happened with the CBE in this case, which was eventually able to recover the unpaid rent owed to it by the State in the court of claims. On the other hand, if a state representative enters into a contract that is *not* statutorily authorized, then nothing in today's opinion will prevent a vendor from suing that representative directly in the circuit court for what they are duly owed.

¶ 70                                    IV. CONCLUSION

¶ 71    Rep. Davis was authorized to enter into this lease on behalf of the State of Illinois. Consequently, any potential tax obligations that accrued under the provisions of this lease are obligations of the State, and the circuit court has no jurisdiction to hear a collection action against the State. The State has sovereign immunity and has consented only to be sued in the court of claims. As the court of claims has exclusive jurisdiction over this dispute, we reverse the circuit court's grant of summary judgment in favor of the County, enter summary judgment in favor of Rep. Davis, and vacate the monetary judgment against Rep. Davis.

¶ 72    Reversed.

¶ 73    PRESIDING JUSTICE PIERCE, dissenting:

¶ 74    I disagree with the majority's conclusion that the State is the true party-in-interest to this dispute and that sovereign immunity deprived the circuit court of jurisdiction to enter a money judgment against Rep. Davis. The majority misconstrues and misinterprets the General Assembly Compensation Act to reach its conclusion that Rep. Davis entered a lease on behalf of the State of Illinois. I respectfully dissent.

¶ 75    If this decision is allowed to stand, it will serve as a template for every legislator to avoid payment to a vendor and force the vendor to sue the State in the Court of Claims based on the

unsupported claim that the legislator acted within the scope of her legislative duties and incurred the expense on the State's behalf. If the annual appropriation is exhausted, the State will not be authorized to make payment and the vendor will be without recourse. The majority's casual dismissal of this possibility is apparently based on the settlement of the CBE's lawsuit against Rep. David for nonpayment of rent in the Court of Claims. Of course, and consistently, the majority has no evidence of why–or on what basis—this claim was resolved or whether, in fact, Rep. Davis had monies remaining in her annual expense appropriation account. And the majority's solution will not be available here if the Court of Claims accepts the obvious position the Attorney General will advance: the State was not a party to this lease. Where will the Cook County taxpayers look then?

¶ 76    Another unacceptable result of this decision is the County is now forced to pursue the State in the Court of Claims for unpaid leasehold taxes where, without question, the State, through the Attorney General—who is representing Rep. Davis in these proceedings—will argue the State was not a party to the lease that gave rise to the leasehold tax or, if it was, it is a tax exempt governmental entity. If these or other defenses are successful, the taxing bodies of the County will be deprived of hundreds of thousands of desperately needed dollars. If these defenses are not successful and the State is found liable for these leasehold taxes, the taxpayers of this State will pay the County the taxes due, not Rep. Davis. Or, if the Court of Claims finds the State is a party to this lease, contrary to the unassailable finding of the IDOR, the State may claim it is prohibited from paying because Rep. Davis exceeded her annual reimbursable allowance, resulting in a substantial loss to the County taxing districts. Any way I look at this result, I see nothing that justifies this most unusual decision.

¶ 77    The majority also puts the burden on the County to prove Rep. Davis did not exceed her annual allowance and if she did, "then she would become, in her personal capacity, a party to that

lease." *Supra* ¶ 63. So now the County is forced into the Court of Claims where its claim could be dismissed if the State prevails in arguing it was not a party to the lease or Rep. Davis's allowance was exhausted, and then forced back to the circuit court where Davis will argue *res judicata* or some other exotic defense because the majority has declared "the State is thus the real party in interest." *Supra* ¶ 41. This makes no sense.

¶ 78    This lawsuit stems from the Property Tax Code, which imposes personal liability on the lessee holding a leasehold interest in real property owned by a tax exempt lessor, the CBE. Contrary to the majority opinion, nonpayment of leasehold taxes does result in a lien being placed: it is placed against the leasehold and the leasehold is subject to the annual tax sale and, like fee estates, the owner of the leasehold is personally liable for the unpaid leasehold tax. In any event, neither the amount nor the validity of the unpaid leasehold taxes levied because of this lease is at issue. There is no dispute the owner of the leasehold interest is personally liable for unpaid real estate taxes extended against the leasehold. 35 ILCS 200/9-195 (West 2020).

¶ 79    There is no dispute that, on its face, the executed lease is by and between the CBE and "State Representative Monique Davis, party of the second part, (hereinafter sometimes designated as 'Lessee')." The lease contains no reference to or identification of the State as having any interest in or obligation under the lease. There is no direct or indirect evidence to support any contention that Rep. Davis informed the CBE that the lease was executed on behalf of any entity or party other than herself. At the very best, the State was an undisclosed party to the lease, and nothing supports an inference the CBE was contracting with any entity other than Rep. Davis. The lease is totally devoid of any specific or implicit statement that Rep. Davis was acting at the direction of or under the authority of the State, and there is no evidence the CBE thought it was contracting with the State. If there was a principal/agent relationship from the perspective of Rep. Davis, she

did not introduce any evidence in the circuit court to support this theory. If the State was in fact the principal behind this lease, one would think the State would have acknowledged this fact, provided this evidence, and supported Rep. Davis's attempts to avoid personal liability for these leasehold taxes. But the State did not do so, and to me it is perfectly clear why: because it was not the undisclosed principal obligated under the terms of the underlying lease.

¶ 80    By executing the lease and as the only signatory to the lease, Rep. Davis, not the State, made a covenant to

> "pay *** (in addition to rents specified) all water supply rates, sewer service, taxes, payments hereunder, *** assessments and levies, general and special, ordinary and extraordinary, of every name, nature and kind whatsoever, which may be taxed, charged, assessed, levied or imposed upon the leasehold estate hereby created and upon the reversionary estate in said premises during the term of this lease."

¶ 81    Proof of liability and fire insurance was to be provided by Rep. Davis, not the State. Notices due under the lease were to be sent to Rep. Davis, not to the State. Rep. Davis's failed to pay statutorily required real estate taxes that she personally agreed to pay, and there is no evidence that she ever authorized the approval of an expenditure in payment of any leasehold tax for any year under the provisions of the Compensation Act.

¶ 82    In deciding whether an action is against the State, courts look to whether the duty the official breached arose solely by virtue of their state employment. *Welch v. Illinois Supreme Court*, 322 Ill. App. 3d 345, 351 (2001). For the purposes of assessing and collecting the leasehold tax, the fact that the lessee is a state representative is completely irrelevant. Here, the unpaid taxes arose because of the CBE leasing the tax exempt premises to Rep. Davis. This statutory leasehold

liability would have arisen regardless of the status or title of the lessee unless the leasehold itself was owned and used by an exempt entity. 35 ILCS 200/15-60 (West 2020). By law, the lessee of a tax exempt leasehold is considered the owner of the leasehold interest and is liable for the resultant taxes. *Id.* § 9-195(a). Here, IDOR found Rep. Davis was not an exempt entity. Rep. Davis was named in this lawsuit as "State Representative Monique Davis" because that was the name on the lease not because she was sued in her official capacity. Rep. Davis's obligation to pay the leasehold tax did not arise by virtue of her state office; her obligation to pay leasehold taxes is completely independent of her role as a state representative and derives solely from her being the sole signatory to the lease.

¶ 83    The liability rests with Rep. Davis alone. The County did not name the State as a defendant and sought no relief against the State. In fact, when IDOR found the subject leasehold was ineligible for an exemption and subject to taxation, the State itself explicitly held that the lease was not owned by an exempt entity—the State of Illinois—and the property was not used for a public purpose. See *id.* §§ 15-55, 15-60. Without reasoned justification or legal support, the majority gives short shrift to IDOR's finding. The majority has no basis to claim the IDOR was "confused" or gave the application "a *pro forma* denial, rather than the careful analysis" that I presume IDOR gives all exemption petitions. *Supra* ¶ 66. The exemption petition submitted by only Rep. Davis, with no assistance or participation by any State agency or the Attorney General, requested information relevant to the exempt status of the leasehold. An examination of the exemption application shows the petitioner as "Monique Davis"; she admitted she did not have a "sales tax exemption number"; she represented that the property was used as a "District office for State Representative Monique D. Davis"; she listed her home address; she disclosed she is "presently the Illinois State Representative from the 27th Representative District in the General Assembly for

the State of Illinois"; and she used "a district office within the boundaries of the 27th Representative District in order to conduct affairs pursuant to my job as an Illinois State Representative. The street address for my district office is 1234 W. 95th St., Chicago, Illinois 60643." IDOR sent several notices asking whether the PIN was a fee interest or a leasehold interest, and Rep. Davis ultimately responded property index number (PIN) 25-05-330-042-8002 was a leasehold interest. All of IDOR's requests were sent to "State Rep. Monique D. Davis." No notices were sent to or applied to the State. Nothing in this record remotely indicates Rep. Davis ever informed the State of this application or her attempts to save her "principal" from any real estate tax liability. Strange conduct for a state representative who presumably knows the law.

¶ 84    Quite literally, the IDOR decision states: "[t]he property is *not in exempt ownership*" and "[t]he property is *not in exempt use*." (Emphases added.) The IDOR exemption denial was not challenged by Rep. Davis. Clearly, the State did not challenge the decision because it was not a party to the exemption petition. Putting aside the Attorney General's obvious conflict of interest in representing both Rep. Davis in this lawsuit and advancing the argument that the State is the true party in interest, one would think the State would have joined in the IDOR exemption petition and put the issue of any leasehold tax liability to rest. The IDOR decision is final and unassailable by Rep. Davis in this litigation. The IDOR decision confirms the State of Illinois had no interest in the underlying leasehold. For Rep. Davis to now assert that her leasehold is in fact the State's is to simply ignore the State's own conclusions declared in the IDOR decision that the leasehold was not owned or used by an exempt entity.

¶ 85    Further, the State is not the actual party at issue in this judgment proceeding because there is no possible adverse impact against the State. See *Welch*, 322 Ill. App. 3d at 351. This lawsuit is not brought against the State and there is no violation of sovereign immunity. This case was

properly filed in the circuit court, as dictated by section 21-440 of the Property Tax Code (35 ILCS 200/21-440 (West 2020)). There is no claim advanced by the County against the State. The claim is asserted against Rep. Davis for nonpayment of the leasehold tax and the law does not impute that liability to the State. Therefore, the Court of Claims Act does not apply because this is not a breach of contract action against the State or a claim against the State founded upon any law of the State of Illinois.

¶ 86    As the majority observes, the lease "did not expressly name the State of Illinois as a party to the transaction." *Supra* ¶ 7. Also, there is no evidence or lease term that suggests the CBE agreed or understood it was contracting with the State of Illinois, and the lease is devoid of any term or provision stating Rep. Davis had authority to act on behalf of the State. The majority observes that, under the lease, "Rep. Davis would agree to 'bear, pay and discharge' any taxes, assessments, or levies imposed upon the leasehold during the term of the lease." *Supra* ¶ 8. Again, the lease created a leasehold interest in favor of Davis, and, as between her and the CBE, she agreed to be personally liable to the county for unpaid leasehold taxes as a matter of law pursuant to section 9-195 of the Property Tax Code (35 ILCS 200/9/195 (West 2020). The Property Tax Code, not the lease, is the basis for this lawsuit and Rep. Davis's personal liability to the County for unpaid leasehold taxes, but the lease is damning evidence of Davis's personal liability because she acknowledged and agreed to the liability imposed under the Property Tax Code. Her claim that she was exempt from property tax liability under the lease is without any legal support and simply not true. Surely, a legislator knows or should know this is not true and, without question, the Attorney General knows this is not true. It is no surprise Rep. Davis never secured any real estate tax exemption as authorized in the Property Tax Code. The County, therefore, continued to levy property taxes against Rep. Davis's leasehold. As it stands, there is no dispute that the lease created a taxable

leasehold and that taxes were properly levied against the leasehold. If leasehold taxes are not paid, the County's recourse is to proceed against the only person who signed the lease: defendant Davis.

¶ 87    The lease also evidences Rep. Davis's acknowledgement of her personal liability for the leasehold tax. The lease specifically references the leasehold tax and a separate clause specifically names Rep. Davis—not the State—as being responsible for the tax. Further, a handwritten provision initialed by Rep. Davis states "Such taxes and assessments shall be prorated to the date on which the Lessee takes occupancy of the Premises." Again, no mention of the State. If the State was the real party in interest, any language dealing with leasehold taxes would likely have been deleted because of the State's general exemption from property taxes. These lease provisions were not boiler plate provisions intended to have no effect. Rather these terms are irrefutable evidence of Rep. Davis, and only Rep. Davis, owning the leasehold interest and her knowledge of the law that imposed personal liability on the owner of the leasehold interest.

¶ 88    The majority concludes a lease for legislative offices falls within scope of the expense office allowance statute and the term "contract services" is relevant to this issue. It is not. The issue here is a nonpayment of leasehold taxes that arise as a matter of law, not by virtue of contract. The lease identifies the owner of the leasehold interest, and the Property Tax Code creates the resultant personal liability.

¶ 89    The majority further concludes that when Rep. Davis executed the lease, she did so in her official capacity as an Illinois state representative and was expressly authorized by the General Assembly Compensation Act to contractually bind the State. *Supra* ¶¶ 43, 51-52. I do not agree that this statutory provision is an express grant of authority to individual representatives to enter into agreements on behalf of the State.

¶ 90    "Express authority is actual authority granted explicitly by the principal to the agent \*\*\*." *Patrick Engineering Inc. v. City of Naperville*, 2012 IL 113148, ¶ 34. "The party alleging an agency relationship must prove it by a preponderance of the evidence." *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 326 Ill. App. 3d 126, 134 (2001). "Whether an agency relationship exists and the scope of the purported agent's authority are questions of fact." *Id.* at 134-35. Here, neither party identifies any questions of fact in need of resolution to address the question of agency. The sole question, as framed by the majority, is whether Rep. Davis acted with express authority to bind the State of Illinois when she executed the lease agreement. I would find on this record that Rep. Davis cannot, as a matter of law, meet her burden of showing that she executed the lease on behalf of the State or that the true party in interest in this lawsuit is the State.

¶ 91    The majority relies on the General Assembly Compensation Act to shift the leasehold tax liability from Rep. Davis to, potentially, the people of the State of Illinois. It does so without a supporting record containing sound legal reasoning advanced by Davis or the Attorney General, as her attorney, in the circuit court. The history of Davis's lease and nonpayment of rent and leasehold taxes spans decades and the operation of the Compensation Act during this period is not developed in the record. My following comments are based on the information I have obtained regarding the current operation and application of existing legislation and legislative rules pertaining to the reimbursement of legislative expenses.

¶ 92    The General Assembly Compensation Act provided "each member of the House of Representatives is *authorized to approve the expenditure* of not more than $35,000 per year \*\*\* to pay for \*\*\* 'contractual services' \*\*\* as defined in 'An Act in relation to State finance' \*\*\*." (Emphasis added.) Ill. Rev. Stat. 1987, ch. 63, ¶ 15.1. It is undisputed that "contractual services" includes expenditures for renting property, not leasehold taxes. This statutory provision makes

plain that a preestablished amount of State funds have been allocated to be used at the discretion of an individual representative in connection the operation of her legislative office and the payment of salaries. The statute also allows a legislator to use personal or campaign funds to pay lease expenses, which presumably would allow for the remaining unencumbered appropriation to be used for other authorized expenses, *e.g.*, additional staff.

¶ 93    The majority's construction of the statute misreads the statutory provisions and expands the office allowance statute by reading in terms that simply do not exist. Our function is to ascertain and give effect to the legislature's intention by reviewing the plain and ordinary language used in the statute without reading in exceptions, limitations, or conditions that conflict with that intent. *State ex rel. Leibowitz v. Family Vision Care, LLC*, 2020 IL 124754, ¶¶ 34, 50.

¶ 94    The majority misreads the statute and quotes only a portion that states "authorized to approve" to confer a broad grant of authority to a legislator. *Supra* ¶ 45. A plain reading of the allowance statute shows that a state representative is authorized *to approve the expenditure* of a capped dollar amount to pay for, among other things, contractual services that include leases for legislative offices. (Emphasis added.) Ill. Rev. Stat. 1987, ch. 63, ¶ 15.1. The statute is silent as whether the legislator is authorized to bind the State and, if she is, what lease terms and provisions must be present to bind the State. Currently, the House offers guidance for direct lease payments from the State to the landlord. Direct payment is initiated by the representative submitting a voucher requesting direct payment from the State treasury to the landlord for a lease preapproved by House staff. The preapproved lease must contain the terms required by staff. The House's guidance instructs members that they must submit a proposed lease to either the Speaker or the House minority leader for approval before the lease is signed and a draft lease containing required terms is provided.

¶ 95     The House's guidance explains that the lease must provide that the lessee is executing the lease on behalf of the House of Representatives in their official capacity as a state representative. And members are advised that if they agree to lease terms that deviate from draft lease agreement, the member may be subject to personal liability for those lease terms. Furthermore, the House's guidance advises that members who choose to pay their rent with personal or political funds run the risk of subjecting the member or their campaign to personal liability on the lease. None of these provisions were alleged or proven to have been complied with in Rep. Davis's case.

¶ 96     The record does not show what, if any, rules or guidance was in effect during Rep. Davis's nearly twenty years of nonpayment of rent and taxes. However, the current guidance highlights just how little the statute says about the authority of a legislator to bind the State to a lease. Yet the majority finds the statute contains sufficient language to infer, as a matter of law, that the State is the actual party to Rep. Davis's lease agreement with the CBE.

¶ 97     Here, Rep. Davis executed the lease as "State Representative Monique Davis," and disclosed that the premises would be used for her district office. But nowhere did she disclose that she was executing the lease in her official capacity on behalf of the State, nor did she disclose that rent payments would be made by the State of Illinois pursuant to the voucher for payment provisions of the allowance statute. The record is also silent as to whether the State historically paid rent directly to the CBE, Rep. Davis ever sought rental reimbursement from the State, or Rep. Davis used the voucher system to pay the CBE directly. Yet the majority concludes that Rep. Davis acted on behalf of the State when she executed the lease merely because she was authorized by statute to approve expenditures to defray authorized costs of running her office.

¶ 98     With no express guidance in the statute giving a representative express authority to legally bind the State to the lease and no facts to suggest that any of the protocols outlined in the statute

were complied with, I would conclude that Rep. Davis failed to meet her burden of showing she was acting with express authority from the State when she executed the lease. It follows that she is personally liable for the property taxes levied against the leasehold interest she created. Furthermore, I note there is absolutely nothing in the record to suggest Rep. Davis ever submitted the tax bills to the State for payment. Even assuming she submitted a voucher for direct payment to the CBE or sought reimbursement for whatever rent payments she did make, her rent obligation under the lease was separate from her statutory obligation to pay real estate taxes. Nothing in the office allowance statute expressly permits a member to incur tax obligations on behalf of the State, and nothing prohibits members from incurring payment obligations for which they are personally liable. Her personal obligation to pay taxes may have arisen from the lease agreement, but nothing in the office allowance statute suggests that she was authorized to incur tax obligations payable by the State. Having created a quandary for herself, Rep. Davis simply chose to ignore the tax bills, unjustifiably believing she did not have to pay them. Now, for reasons that are inexplicable to me, the Attorney General has stepped in to argue, on Rep. Davis's behalf, that the County's effort to collect delinquent property taxes against the owner of a leasehold interest, created by one who happens to be a state representative, is somehow a claim against the State that belongs in the Court of Claims. The judgment of the circuit court should be affirmed.

¶ 99       By its own terms, General Assembly Compensation Act only expressly authorizes a legislator to approve expenditures, *i.e.*, spend money. The statute further provides that the Speaker of the House (Speaker) shall voucher for payment individual members' expenses, suggesting that an individual member must submit their expenditures for approval, including lease expenses, to the Speaker for direct payment to the vendor. One of the types of allowed expenses are expenses for leased office space. Clearly, real estate taxes are not listed and are not subject to reimbursement

- 30 -

most likely because the gross rent usually includes the tax component. Critically, only the House guidance instructs on direct State liability for legislative offices and that occurs only if a specific, preapproved lease is used and there is an available appropriation. And, where the allowed expenditure exceeds the annual appropriation, the legislator is allowed to spend personal or campaign funds to cover the balance. See 25 ILCS 115/4 (West 2020) ("Nothing in this Section prohibits the expenditure of personal funds or the funds of a political committee controlled by an officeholder to defray the customary and reasonable expenses of an officeholder in connection with the performance of governmental and public service functions."). Clearly, the statute contemplates the legislator spending their funds, not the State's funds, to meet expenses in excess of the annual appropriation.

¶ 100   It is axiomatic that State officers can exercise only that authority granted them under the constitution or the laws of this State. The legislature knows how to expressly authorize agents of the State to contract on behalf of the State and has done so through a comprehensive set of procurement rules. For instance, Title 44 of the Illinois Administrative Code is entitled "Government Contracts, Grantmaking, Procurement, and Property Management." Title 44 provides a detailed set of rules and regulations governing the formation of enforceable State contracts. Numerous constitutional offices and agencies are vested with express authority to enter into lease agreements for real property, including, for example, the Attorney General. See 44 Ill. Adm. Code 1300 Subpart N. Specific lease requirements must be met for the Attorney General to enter a binding lease agreement. See 44 Ill. Adm. Code 1300.4025 (2016).

¶ 101   Employing a substantive analysis to determine whether the County's action here is against the State, I would find that Rep. Davis, acting on her own initiative, entered a lease agreement with CBE on her own behalf, with the expectation that the costs of the lease would be defrayed through

the voucher system established by the office allowance statute. Her individual choice to enter a lease agreement with a tax-exempt entity, coupled with her failure to establish and obtain an exemption for the leasehold interest, led to property taxes levied against her leasehold interest, which she alone, as the leaseholder, was individually liable for paying. She exercised her own discretion in choosing where to locate her legislative office and exercised her own discretion in the lease terms she agreed to. As a legislator she certainly cannot claim ignorance of the law. The State did not participate in formulating the lease or its approval or otherwise have anything to do with it. At best, the lease only allowed Rep. Davis to seek reimbursement for any qualified expenditure she made within the annual appropriation authorized under the office allowance statute. Rep. Davis has not identified any statute or case law showing that she was contracting on behalf of the State when she executed the CBE lease. Sovereign immunity has no bearing on the County's action to obtain a judgment against her, the owner of the taxable leasehold interest, for the hundreds of thousands of dollars in delinquent leasehold taxes she owes. I would affirm the judgment of the circuit court.

**No. 1-19-1959**

| | |
|---|---|
| **Cite as:** | *People v. Davis*, 2021 IL App (1st) 191959 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2012-COAC-1; the Hon. James R. Carroll, Judge, presiding. |
| **Attorneys for Appellant:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Paul Racette, Assistant Attorney General, of counsel), of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Cathy McNeil Stein and Anthony O'Brien, Assistant State's Attorneys, of counsel), for the People. |